## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

JAMIE WHITE,

    Plaintiff,

v.

PAULDING COUNTY GOVERNMENT,
PAULDING COUNTY DISTRICT
ATTORNEY'S OFFICE a/k/a
PAULDING COUNTY JUDICIAL
CIRCUIT OFFICE OF THE DISTRICT
ATTORNEY, PROSECUTING
ATTORNEYS' COUNCIL OF
GEORGIA, and DICK DONOVAN
(Individually and in his Official Capacity),

    Defendants.

Civil Action No.

_____

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES

Plaintiff Jamie White ("Plaintiff" or "Ms. White") files this Complaint for Damages, showing the Court as follows:

## NATURE OF COMPLAINT

1.    Plaintiff invokes the jurisdiction of this Court and brings claims of sexual harassment and retaliation against Defendants Paulding County Government by and through its governing authority Paulding County Board of Commissioners ("Paulding County"), Paulding County District Attorney's Office ("DA's Office"),

the Prosecuting Attorneys' Council of Georgia ("PAC") and District Attorney Dick Donovan (in his official and individual capacities) ("DA Donovan") under the Equal Protection Clause of the Fourteenth Amendment to the United Stated Constitution as enforced through 42 U.S.C. §1983.  Plaintiff further asserts related tort claims under Georgia law.   Plaintiff seeks declaratory and injunctive relief, damages and attorneys' fees and costs.

## JURISDICTION AND VENUE

2.     Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and 42 U.S.C. § 1983.

3.     The unlawful employment practices alleged in this Complaint were committed within this district and Plaintiff and Defendants reside in the district.  In accordance with 28 U.S.C. § 1391(b), venue is appropriate in this Court.

## PARTIES

4.     Plaintiff is a resident of Haralson County in the Northern District of Georgia and is subject to this Court's jurisdiction.

5.     Defendant DA Donovan is named in his individual and official capacities.  DA Donovan is currently the District Attorney for Paulding County, Georgia.  Mr. Donovan has held this position since on or about January 1, 2011.  Mr. Donovan can be served with process at his residence in Hiram, Georgia and/or at the

Office of the District Attorney, 280 Constitution Boulevard, Room 2072, Dallas, Georgia 30132.

6.    Defendant Paulding County Government is a municipal corporation doing business in the State of Georgia and is, therefore, subject to personal jurisdiction in Georgia.  Paulding County may be served with process by serving Chairman of the Paulding County Board of Commissioners, Dave Carmichael, at 240 Constitution Boulevard, Dallas, Georgia 30132.

7.    Defendant DA's Office is an agency of the Paulding County Judicial Circuit and an extension of the State of Georgia.  *See* O.C.G.A. §§ 15-18-4, 15-18-19. Defendant may be served with process by service upon District Attorney Dick Donovan at the Office of the District Attorney, 280 Constitution Boulevard, Room 2072, Dallas, Georgia 30132.

8.    Defendant PAC is a state agency within the judicial branch of the State of Georgia, and supports the efforts of the local prosecuting attorneys in the various judicial circuits of the State of Georgia.  In doing so, Defendant PAC provides budget estimates, administrative functions, services, supplies, equipment, and/or operating expenses to prosecuting attorneys, including DA Donovan and his office in Paulding County.  Defendant PAC may be served with process upon its Executive Director Peter J. Skandalakis, at 1590 Adamson Parkway, Morrow, Georgia 30260.

9.     During the relevant time period, Defendant PAC also provided state paid employees to district attorneys in Georgia, including DA Donovan and his office, and/or supplemented the salaries for district attorneys and members of their staffs in Georgia with state funds, including DA Donovan and those working in his office.

10.     Defendants are a joint employer of Plaintiff and/or constitute an integrated enterprise for purposes of the federal statutes and/or laws under which this action is brought.

## STATEMENT OF FACTS

11.      Ms. White works as a victim witness coordinator in the DA's Office and has worked there since 2008.

12.     In September 2017, DA Donovan presented Plaintiff with an award at the Chamber of Commerce and publicly stated Plaintiff "is as conscientious and industrious as she is hard working, and she works harder than anyone else in the District Attorney's office," and described that with respect to the unit Plaintiff managed, "I know it's in good hands and that it always will be in good order, so long as Jamie White is willing to continue as my Victim Witness Coordinator.  Please stay …."

4

13.    Since October 2017, DA Donovan, her direct supervisor, has subjected Ms. White to sexual harassment.

14.    Mr. Donovan has repeatedly told Ms. White he is in love with her, sent her personal text messages and emails, given her unwanted gifts, invited her to private lunches and trips, posted encrypted Facebook messages about her, forced her to sit in lengthy private meetings in his office, described his fantasies of having a relationship with her and his desires for a physical relationship with her, and has subjected her to unwanted touching.

15.    Mr. Donovan has repeatedly forced Ms. White to listen to him reading from a "novel" he claims he is writing about Ms. White and himself, wherein he describes his desires and fantasies, during her work hours and in work offices with the door closed.

16.    At all times Ms. White has made it clear to Mr. Donovan that she has no interest in a personal relationship with him and has repeatedly asked him to stop the harassment.

17.    When Ms. White asked Mr. Donovan to stop his unwanted overtures, he would become angry and upset, refuse to communicate with her regarding work-related issues for a period of time, subject the entire office to his frustration with Ms.

White with actions such as slamming doors and refusing to speak, and then begin the harassment of Ms. White again.

18.     On December 5, 2017, Plaintiff sent DA Donovan a text that clearly stated she did not wish to any more contact with him that was not work related and that all contact should be done via work email.

19.     At that time, DA Donovan did briefly stop contacting Plaintiff and giving her gifts, but he was demonstrably upset with Plaintiff, refused to engage with her with respect to work matters, and barely spoke to her at all.

20.      DA Donovan's overtures to Plaintiff began again in February and by March 17, 2018 DA Donovan informed Plaintiff, "you can't possibly think for one minute that I was going to read your text on December 5th and go away without a fight."

21.     DA Donovan's hostile treatment had direct impact on Plaintiff's work.

22.     Each and every time DA Donovan became upset with Plaintiff for not reciprocating his feelings, he would not come out of his office or speak to Plaintiff until she met with him to let him talk to her about his desires in private.

23.     These long conversations happened frequently and during the normal work hours at the office.  Plaintiff often felt the pressure from others in the office to "just go down there and talk to him and fix whatever is".

24.   Plaintiff reasonably believed that "fixing things around the office" for everyone meant she had to continue meeting privately to allow DA Donovan to discuss his feelings and love towards her and/or ask Plaintiff about her personal feelings and personal relationships.

25.   These "meetings" with DA Donovan and Plaintiff were sometimes held in Plaintiff's office with the doors closed.  Most frequently, these "meetings" were held in DA Donovan's office or a conference room with the doors closed, or outside of the office located in a back hallway.

26.    These "meetings" DA Donovan required Plaintiff to sit through were behind closed doors, and often DA Donovan would lock the office door during these meetings.  DA Donovan would sit between Plaintiff and the closed or locked office door.  DA Donovan is more than a foot taller than Plaintiff and has a physically intimidating presence.

27.   During these forced "meetings," Plaintiff reasonably believed she was not free to leave the office or conference room, and DA Donovan physically impeded her ability to leave.

28.   DA Donovan regularly asked Plaintiff to private lunches.

29.   These invitations for lunch always referenced places outside of the county, and DA Donovan told Plaintiff this was so that Plaintiff and DA Donovan

would not be seen together. Plaintiff repeatedly declined his invitations and explained to DA Donovan on numerous occasions that such lunches are not appropriate.

30.    In November 2017, while riding back to the office with DA Donovan back from a civic luncheon, DA Donovan pulled the car off the road onto a back road and told Plaintiff he wanted them to "talk for awhile".  While DA Donovan expressed his feelings for Plaintiff and desire to have a relationship, Plaintiff was very nervous but tried to be courteous to DA Donovan regarding his unwanted overtures so that this episode would end and he would take her back to the office.

31.    During this car ride, Plaintiff reasonably believed she was not free to leave and that DA Donovan was physically impeding her ability to leave.

32.    DA Donovan also physically harassed Plaintiff.

33.    On numerous and frequent occasions, DA Donovan held Plaintiff's hand, gave Plaintiff long hugs, grabbed both of Plaintiff's shoulders and kissed her eyelids.  DA Donovan also grabbed Plaintiff's shoulders and kissed her forehead.

34.    Plaintiff did not consent to any of this physical contact from DA Donovan.

35.    DA Donovan has repeatedly expressed to Plaintiff that he is in love with her and that he believes "one day" they will be together.  As a message to Plaintiff

DA Donovan purchased an ad in The Dallas New Era newspaper that said "One day." and gave Plaintiff a copy.

36.     DA Donovan gave Plaintiff gifts, including jewelry and his own fantasy writings about their relationship.  If Plaintiff did not "display" his cards and gifts in her office and/or show her "appreciation" for his gifts, he would stop speaking to Plaintiff until she did so.

37.     DA Donovan has forced Plaintiff to sit and listen to him read aloud from a "fantasy novel" he claims to be writing about he and Plaintiff taking trips together, which he tells Plaintiff is "our story."

38.     Others working in the DA's Office noticed Plaintiff would leave long, closed door office meetings with Donovan showing visible signs of crying.

39.     In January 2019, DA Donovan asked Plaintiff to leave the office with him for a walk, and when she refused, he returned to tell her he was very upset with her and that he "has needs."

40.     As Plaintiff repeatedly refuses DA Donovan's overtures, he has become more and more angry with her at work, despite her begging him to leave her alone and just let her do her job.

41.     DA Donovan used his power and control to make Plaintiff feel that there was nothing she could do to stop his sexual harassment. Plaintiff felt the

pressure of trying to keep DA Donovan "happy" in order to keep her job and to keep the peace of an entire office.

42.     At all times since Mr. Donovan began the harassment, Ms. White has been terrified that she would lose her job if she tried to report his misconduct, and his constant overtures to her in the workplace have impacted the terms and conditions of her employment and caused her anxiety, shame and severe emotional distress.

43.     Other employees in the workplace questioned Mr. Donovan's behavior, and at one point, Mr. Donovan held individual employee "interviews" and a staff meeting to address "gossiping and rumors" in the office, and he specifically discussed "rumors" that Ms. White was having an affair with him and/or other males. Plaintiff was humiliated and ashamed by being forced by DA Donovan to sit through a staff meeting and purported witness interviews as he questioned employees about Ms. White's purported personal relationships and behaviors.

44.     Mr. Donovan has repeatedly told Ms. White that he is "the most powerful man in Paulding County" and talked about how he can fire anyone in his office.

45.     Although Ms. White has repeatedly asked him to leave her alone and allow her to do her job, it has become clear that Mr. Donovan will not stop harassing

her.  DA Donovan told Plaintiff that he was not going to ask her permission to speak about what he wants, that "I don't think that a man in my position should have to ask for permission," and that "I am in love with you, and I know you don't like to hear those things," among other comments.

46.    Because of the serious impact of Mr. Donovan's harassment on Ms. White's physical and mental well-being, Ms. White decided to make a formal complaint regarding his conduct.  On April 26, 2019, Ms. White submitted a formal written complaint of sexual harassment to Paulding County Human Resources, the DA's Office, DA Donovan, and PAC.

47.    Until Plaintiff filed her formal complaint, DA Donovan frequently sent her text messages and encrypted Facebook messages professing his love for her.  His written messages to Plaintiff include such language as "after having held you[r] hand for nearly an hour," "[i]t was not wrong for me to sit with you and try to calm you down and comfort you.  Probably everything else after that was a mistake on my part," "[d]o I still believe that 'One day…'?  Yes.  I not only believe it, I know it," and "[Y]ou really *are* afraid of me."

48.    When DA Donovan asked Plaintiff to attend a Chamber of Commerce luncheon with him, he texted her, "I'll let you drive the Suburban and I'll sit in the back.  I can lend you my handcuffs. … Although I have always carried a handcuff

key.  I don't own a straitjacket But I'll buy one if you would prefer that level of safety".

49.     Since Plaintiff made her formal complaint, DA Donovan has refused to speak to Plaintiff and used other managers in the office to circumvent her authority and supervisory responsibilities.  The retaliation has added to an already extremely hostile work environment.

50.     Ms. White received no response to her formal complaint from the DA's Office other than an email stating her complaint was being reviewed.

51.     Defendant PAC responded to Plaintiff's formal complaint by stating that she was "not their employee" and to Plaintiff's knowledge, PAC has taken no action against DA Donovan or to otherwise investigate or stop the harassment.  DA Donovan reports to and/or is supervised by PAC.

52.     Paulding County Human Resources eventually began an investigation, but took no further action against DA Donovan or to otherwise stop the harassment.

53.     Apparently in response to Plaintiff's formal complaint, on May 2, 2019 DA Donovan elected to make a "sworn affidavit before a certified court reporter" (the "Affidavit"). Also present was the Operations Manager of the DA's Office, Tiffany Watson.  DA Donovan provided the Affidavit to Paulding County and PAC.

54.    In the Affidavit, DA Donovan stated that he was not interacting with Plaintiff "at all" since she made her formal complaint.

55.    Rather than taking any action to stop DA Donovan's harassment, on June 21, 2019, after reporting the hostile and retaliatory work environment she was experiencing and asking whether she could work on a grant proposal from home, Plaintiff was advised she could work from home.  Working remotely has directly impacted Plaintiff's ability to interact with others in the DA's Office on work-related matters.

56.    Paulding County utilized the services of a third-party investigator to conduct the investigation into Plaintiff's claims regarding DA Donovan.

57.    The third-party investigator submitted a report of the investigation's findings to Paulding County.

58.    Paulding County shared a copy of its report of the investigation findings with PAC.

59.    Paulding County reached out to the State of Georgia Attorney General's Office (which represents state agencies including PAC), PAC, and the DA's Office regarding "the County's findings of harassment."

60.    Plaintiff's position in the DA's Office was the only position with "coordinator" in the title.

61.    According to the Confidential Investigation Report submitted to Paulding County, the investigation found that Plaintiff's allegations regarding DA Donovan were "substantially supported with corroborating evidence."

62.    According to Paulding County's written submission to a federal agency, "[o]utside counsel thoroughly investigated the matter and did find that the District Attorney likely did harass Ms. White and retaliated against her for reporting the harassment and discrimination."

63.    The investigation further found that many of Plaintiff's allegations regarding DA Donovan were "supported in whole or in part by Mr. Donovan's own statements … given under oath."

64.    The investigation further found that "not only is there clear and credible evidence that Mr. Donovan engaged in workplace conduct that could be considered harassment prohibited by Paulding County policies, he may also be engaging in conduct that may rise to the level of retaliation."

65.    The investigation concluded that "[b]ecause [Plaintiff's] allegations are directly and indirectly corroborated in substantial part, and because of the critical disparities between the evidence and Mr. Donovan's statements regarding essential elements of [Plaintiff's] allegations, there is a reasonable basis to conclude that Mr.

Donovan engaged in conduct that is prohibited by the Paulding County Board of Commissioner's Sexual Harassment Policy."

66.     Paulding County, the DA's Office and PAC had notice of a 2017 EEOC Charge of Discrimination filed by a female Operations Manager of the DA's Office who reported directly to DA Donovan alleging sex, age, and disability discrimination and retaliation ("the 2017 EEOC Charge").  The 2017 EEOC Charge alleged in part: "Throughout my employment, DA Donovan treated me poorly because I am an older woman and made numerous chauvinist and sexist comments. Female staff regularly complained about how inappropriate DA Donovan acted."

67.     In response to the 2017 EEOC Charge, DA Donovan submitted a written statement to Paulding County's Human Resource Director Brian Acker stating in part "I made no sexist or discriminatory remarks," and claiming that the female employee who filed the 2017 EEOC Charge "created and fostered a hostile work environment in this office."

68.     The 2017 EEOC Charge was under investigation at the federal agency until the female employee was issued a Notice of Right to Sue in 2018.  In September 2018, the female employee filed suit against the DA's Office and PAC, and the action was removed to this Court as Civil Action No. 1:18-cv-04325-ELR.

69.    At no time did the DA's Office, PAC, or Paulding County investigate the 2017 EEOC Charge's allegation that female staff "regularly complained about how inappropriate DA Donovan acted."

70.    At no time did the DA's Office, PAC, or Paulding County ask Plaintiff any questions regarding the 2017 EEOC Charge's allegation that female staff "regularly complained about how inappropriate DA Donovan acted."

71.    Paulding County, the DA's Office and PAC knew or should have known that DA Donovan posed a risk of subjecting Plaintiff to the harassment and tortious conduct described herein.

72.    At all relevant times Paulding County, the DA's Office and PAC were aware of DA Donovan's propensity to engage in inappropriate verbal or physical conduct with subordinates.

73.    Paulding County, the DA's Office and PAC were aware that DA Donovan's conduct had created a hostile work environment for one or more employees prior to Plaintiff's April 2019 formal complaint to them.

74.    Supervisors and managers who worked in the DA's Office and were also employees of PAC knew that DA Donovan was subjecting Plaintiff to unwanted sexual harassment and/or creating a hostile work environment prior to Plaintiff's April 2019 formal complaint.

16

75.     Paulding County, the DA's Office and PAC chose not to take reasonable steps to prevent DA Donovan's harassing conduct, discrimination, and/or retaliation toward Plaintiff despite their knowledge of DA Donovan's propensity for such inappropriate conduct and/or that DA Donovan was engaging in such conduct.

76.     As a Victim Witness Coordinator in the DA's Office, DA Donovan has advised Plaintiff that she can be terminated solely in his discretion.

77.     Plaintiff also understood that at times (including in 2018) she was employed with and paid by PAC as a "PAC SPCR" employee, an abbreviation for "state paid county reimbursed."  PAC provides state salaries for individuals hired by DA Donovan and working in the DA's Office.

78.     As part of her job responsibilities as a Victim Witness Coordinator for PAC, Plaintiff drafts grant requests for PAC which fund PAC's victim witness employees' pay.

79.     DA Donovan was authorized to appoint victim assistance personnel including Plaintiff in accord with PAC's staffing plan and budget for victim assistance services.

80.     DA Donovan was required to timely notify PAC in the event that any state paid employee is to be removed from the payroll for any reason.

81.    Plaintiff's direct supervisor DA Donovan is a district attorney whose compensation is paid from PAC's state funds in accord with PAC's established salary schedules.  Paulding County may also supplement DA Donovan's salary in any amount determined by Paulding County's governing authority.

82.    The number of state paid personnel which DA Donovan was authorized to appoint is determined by the state legislature or by contract between Paulding Count and PAC.

83.    Under Georgia law, a district attorney's victim assistance coordinator role is a state-paid position allocated to the judicial circuit.  Plaintiff's victim assistance coordinator role is a position created by Georgia statute.

84.    In July 2018, Plaintiff received a letter from Paulding County "as confirmation of the employment offer as Victim Witness Coordinator with the District Attorney's Office.  Although Paulding County will be your employer, please note that this is a NON-Civil Service position, and that you work at the pleasure of the District Attorney."  Plaintiff was thereafter required to report her work hours and paid time off to Paulding County, received her salary payments through Paulding County's direct deposits, and also understood that Paulding County's policies and procedures applied to her, in addition to the policies and procedures of the DA's Office and PAC already applicable to her.

85.     Paulding County required Plaintiff to complete an "application for hire" and a drug screen, maintained periodic performance reviews for Plaintiff, and required her to submit travel logs of her training.

86.     As part of her grant work, Plaintiff worked directly with the Paulding County Finance Department on at least a quarterly basis.

87.     Although Paulding County's Sexual Harassment Policy permits appropriate redaction of the report of its investigation prepared by outside counsel in order to protect the privacy of and minimize the embarrassment to Plaintiff, Paulding County produced the investigation report, its attachments, and the Affidavit to the media in connection with the Georgia Open Records Act. Its redactions were insufficient to prevent the media from identifying Plaintiff as the complainant.  As a result, Plaintiff's name, the detailed allegations of the sexual harassment she experienced, and DA Donovan's comments about her were published in multiple media formats prior to the filing of this action.

## Governmental and Decision Maker Liability

88.     The highest County official with authority to hire, fire, transfer, demote, promote, discipline, and take other personnel actions affecting employees of the DA's Office, including Plaintiff, made or approved the harassment and/or some or all of the adverse employment actions in this case.

19

89.     Some or all of the above-pled employment actions were neither subject to, nor required, higher review or approval.   Some or all of the above-pled employment actions were also not subject to appeal or reversal by any other official or entity.

90.     Upon information and belief, DA Donovan was the final decision maker with respect to Plaintiff's terms and conditions of employment.

91.     Upon information and belief, DA Donovan was the final policy maker with respect to some or all of the unlawful employment actions giving rise to this Complaint.

92.     DA Donovan undertook all of the unlawful conduct giving rise to the Plaintiff's claims while acting under color of state and local law.

93.     At all times material to this Complaint, it was clearly established law that subjecting a subordinate to sexual harassment or a sexually hostile working environment based upon gender violates the Equal Protection Clause.

94.     At all times material to this Complaint, it was clearly established law that a supervisor may not take an adverse employment action against a subordinate because she rejects or complains about his sexual advances.

**Punitive Damages Allegations**

95.    DA Donovan undertook all of the above-pled unlawful conduct intentionally, willfully, and maliciously with respect to Plaintiff and her federally protected rights.

96.    Additionally, and in the alternative, DA Donovan undertook all of the above-pled conduct with reckless disregard for Plaintiff and her federally protected rights.

## CLAIMS FOR RELIEF

### COUNT I
**Sexual Harassment and Retaliation in Violation of the Equal Protection Clause of the U.S. Constitution Through 42 U.S.C. § 1983 (Against All Defendants)**

97.    Plaintiff realleges the preceding paragraphs.

98.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution entitles Plaintiff to equal protection under the laws regardless of her gender.

99.    Defendants Paulding County, the DA's Office and PAC are governmental entities subject to the Fourteenth Amendment as applied through 42 U.S.C. § 1983, and each constitute a "person" as defied by relevant caselaw interpreting 42 U.S.C. § 1983.

100.   DA Donovan violated Plaintiff's rights to equal protection by, among other things, subjecting her to a sexually harassing and hostile working environment. DA Donovan violated Plaintiff's rights to equal protection by taking adverse employment actions against the Plaintiff for her refusal to acquiesce to sexual advances, based upon her gender, and for reporting such harassment.

101.   Paulding County, the DA's Office, PAC and DA Donovan violated Plaintiff's rights to equal protection by failing to take reasonable preventative or corrective measures with respect to the unlawful harassing conduct.

102.   The conduct of Defendants constitutes unlawful sexual harassment, based upon gender, in violation of the Equal Protection Clause. Additionally, and in the alternative, Defendants' unlawful conduct constitutes sexual harassment culminating in an employment action against the Plaintiff and/or interference with the terms and conditions of her employment.

103.   Defendant DA Donovan undertook all of the unlawful conduct giving rise to the Plaintiff's claims while acting under color of State and local law.

104.   Defendant DA Donovan's unlawful conduct violated the above-pled clearly established law.

105.   As a direct and proximate result of all of the Defendants' actions, Plaintiff has suffered damages including severe emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

106.   Defendant DA Donovan undertook his unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against him.

107.   Alternatively, Defendant DA Donovan undertook his unlawful conduct recklessly with respect to the Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against him.

## COUNT II
### Civil Assault
### (Against Defendant DA Donovan)

108.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

109.   As described above, Defendant DA Donovan placed Plaintiff in reasonable apprehension of immediately receiving an unwanted touching from DA Donovan in an offensive manner.  DA Donovan also committed sexual assault against Plaintiff by touching her and making unwanted sexual advances.

110.   As a result of DA Donovan's conduct, Plaintiff has suffered and is continuing to suffer injury including emotional pain, suffering, humiliation, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT III
## Civil Battery
## (Against Defendant DA Donovan)

111.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

112.   Defendant DA Donovan intentionally made offensive physical contacts with Plaintiff's body without Plaintiff's consent.

113.   As described above, on each occasion DA Donovan touched Plaintiff in an offensive manner, DA Donovan committed battery in violation of Georgia law.

114.   As a result of DA Donovan's conduct, Plaintiff has suffered and is continuing to suffer injury including emotional pain, suffering, humiliation, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT IV
## False Imprisonment
## (Against Defendant DA Donovan)

115.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

116.   DA Donovan physically impeded Ms. White's ability to leave an office, conference room and his car.

117.   By blocking Ms. White from exiting an office, conference room or vehicle, DA Donovan unlawfully detained Ms. White and deprived her of her personal liberty, thereby committing the intentional tort of false imprisonment.

118.   As a result of DA Donovan's conduct, Plaintiff has suffered and is continuing to suffer injury including emotional pain, suffering, humiliation, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT V
## Intentional Infliction of Emotional Distress
### (Against Defendant DA Donovan)

119.   Plaintiff incorporates the preceding paragraphs of the Complaint by reference.

120.   As a result of the conduct described above, DA Donovan caused Plaintiff to suffer intentional infliction of emotional distress in violation of Georgia law.

121.   The conduct directed to Plaintiff by DA Donovan was intentional, the conduct was so outrageous in character and extreme in degree as to go beyond all possibly bounds of decency, the wrongful conduct caused Plaintiff to suffer emotional distress, and Plaintiff's emotional distress was severe.

25

122.   As a result of the above-described conduct, Plaintiff has suffered and is continuing to suffer injury including emotional pain, suffering, humiliation, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT VI
### Ratification
**(Against Defendants Paulding County, the DA's Office, and PAC)**

123.   Plaintiff incorporates the preceding paragraphs of the Complaint by reference.

124.   When DA Donovan engaged in the tortious conduct described above, he was acting within the scope of his employment as a supervisor and the District Attorney for Paulding County.  Defendants Paulding County, the DA's Office, and PAC further ratified DA Donovan's tortious conduct, and therefore assumed liability for his conduct.

## COUNT VII
### Negligent Retention and Supervision
**(Against Defendants Paulding County, the DA's Office, and PAC)**

125.   Plaintiff incorporates the preceding paragraphs of the Complaint by reference.

126.   As a result of Plaintiff suffering the above-described tortious conduct, including but not limited to battery, assault, false imprisonment and intentional infliction of emotional distress, Defendants Paulding County, the Paulding County

26

DA's Office, and PAC are liable to Plaintiff for their negligent retention and supervision of DA Donovan.

127.   Defendants Paulding County, the DA's Office, and PAC knew or should have known that by retaining DA Donovan as the Paulding County District Attorney and/or failing to appropriately supervise DA Donovan in the workplace, it was reasonably foreseeable in light of his known prior conduct that he would cause the type of harm Plaintiff suffered.

128.   As a result of the above-described conduct, Plaintiff has suffered and is continuing to suffer injury including emotional pain, suffering, humiliation, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

**COUNT VIII**
**Punitive Damages Under O.C.G.A. §51-12-5.1**
**(Against Defendant DA Donovan)**

129.   Plaintiff re-alleges the preceding paragraphs.

130.   DA Donovan's tortious acts were intentional and humiliating and evince a concious disregard for the circumstances and rights of Plaintiff and a specific intent to cause harm.  Plaintiff is entitled to recover from DA Donovan, in addition to compensatory damages, an award of punitive damages under Georgia law to punish him and/or deter him from repeating such wrongful acts.

## COUNT IX
### Attorneys' Fees and Expenses of Litigation Under Georgia Law
### (Against all Defendants)

131.   Plaintiff re-alleges the preceding paragraphs.

132.   Defendants have acted in bad faith, been stubbornly litigious, and/or caused Plaintiff unnecessary trouble and expense in litigating this case, and Plaintiff is entitled to recover the expenses of this litigation, including attorneys' fees, under Georgia law.

## PRAYER FOR RELIEF

Plaintiff demands a TRIAL BY JURY and the following relief:

(a)   A declaratory judgment that Defendant(s) violated Plaintiff's rights under the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution;

(b)   An injunction restraining Defendant(s) and their officers, agents, employees, successors, and any other persons acting in concert with them, from engaging in such unlawful conduct in the future;

(c)   Damages equal to the amount of time, lost pay and benefits, lost opportunities, and expenses suffered by Plaintiff due to the unlawful harassment and retaliation perpetrated by Defendant(s), with prejudgment interest;

28

(d)     Compensatory damages, in an amount to be determined by a jury for Plaintiff's emotional distress, loss of professional reputation, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(e)     Punitive damages where permitted by statute in an amount to be determined by a jury to punish those Defendant(s) for their conduct toward Plaintiff sufficient to deter those Defendant(s) from similar conduct in the future;

(f)     Reasonable attorneys' fees and costs where permitted by statute;

(g)     Trial by jury as to all issues so triable; and

(h)     Such additional relief as the Court deems proper and just.

Respectfully submitted, this 9th day of October, 2019.

> */s/Tracey T. Barbaree*
> Tracey T. Barbaree
> GA Bar No. 036792
> Beth A. Moeller
> GA Bar No. 100158
> MOELLER BARBAREE LLP
> 181 14th St. NE, Suite 401
> Atlanta, GA 30309
> Phone: 404.748.9122
>
> *Attorneys for the Plaintiff*